# EXHIBIT B

# IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| PEOPLE OF GUAM ) | SEARCH WARRANT NO. SW 0003-08 |
| ) | |
| vs. ) | **AFFIDAVIT FOR SEARCH WARRANT** |
| ) | |
| SONG JA CHA ) | Guam Police Department Case Nos. 2008-01208 |
| F/KOREAN/SS#XXX-XX-9354 ) | |
| DOB: JANUARY 7, 1942 ) | |
| ) | |
| BLUE HOUSE LOUNGE ) | |
| LOT 5097-4 (FINEGAYAN, HARMON) ) | |
| 910 NORTH MARINE DRIVE ) | |
| HARMON / UPPER TUMON AREA ) | |
| TAMUNING, GUAM     AND ) | |
| ) | |
| 910-A NORTH MARINE DRIVE ) | |
| HARMON / UPPER TUMON AREA ) | |
| TAMUNING, GUAM ) | |
| ) | |
| Defendant ) | |

GUAM )
)
)S.S.
City of Hagåtña )
)

Comes now Special Agent John A. Perez, a duly appointed Officer with the Guam Police Department (GPD), and upon oath, information and belief, alleges as follows:

## BACKGROUND OF AFFIANT

I have been, and at all times herein relevant, a Police Officer with the GPD. I have been a Police Officer for approximately nine and one half (9-½) years, and am currently assigned to the Criminal Investigations Section (CIS) of the Criminal Investigations Division (CID). During my time as a Patrol Officer and Criminal Investigator, I have participated in the investigation of approximately 6,000 complaints of criminal activity, to include Homicides, Suspicious Deaths, Unresolved Death Investigations, Robberies, Kidnappings, Burglaries, Sex Crimes, Assault, Family Violence, and Narcotics related Cases, in which I have gained knowledge and experience in the identification, preservation, processing, and confiscation of evidence, as well as other



investigative aspects relative to these cases. In my time at the CID, I have drafted, executed, and returned approximately thirty-seven (37) Search Warrants issued by the Court for various investigations conducted by Law Enforcement entities throughout Guam.

## STATEMENT OF PROBABLE CAUSE

My current duties have brought me to continue into the investigation of a Criminal Sexual Conduct complaint, filed under GPD Case Number 2008-01208. I have Probable Cause to believe that a search of the Blue House Lounge and the defendant's residence, located at 910 and 910-A North Marine Drive, in the Harmon/Upper Tumon area of Tamuning, Guam, further described as LOT 5097-4 Finegayan Harmon, Guam, will yield evidence substantial to this investigation. Probable Cause is based on the following facts:

1. That I reviewed reports submitted by GPD Police Officers submitted in reference to this investigation.
2. That I reviewed a copy of the Preliminary Report submitted by POI Mario L. Laxamana.
3. That Officer Laxamana's report indicated that on January 13, 2008, at about 12:15AM, he was at the parking lot of the Blue House Karaoke Lounge in Harmon (hereinafter referred to as the "Blue House") on an unrelated call, when he was informed by Police Officer 3 T.B. Manibusan that he had received a call from his (Manibusan's) wife, identified as Marisa Manibusan.
4. That Marisa informed Officer Manibusan that two individuals, identified as Sonina Suwain and Elizabeth Aizawa came to Officer Manibusan's residence requesting for assistance in retrieving Suwain's passport from the owner of the Blue House.
5. That at about 12:25AM on the same date, Officer Laxamana conducted an interview of Sonina Suwain (F/Chuukese/DOB: February 9, 1989) at the parking lot of the Blue House.
6. That Suwain's statements indicated that "Mama San," and further identified as the owner of the Blue House, had confiscated Suwain's passport and refused to return it to her.
7. That there was also the "possibility of prostitution" occurring within the establishment.
8. That Suwain also identified two of her cousins, "Vivian," and "Cindy," whom she stated were within the establishment and that the owner had confiscated their passports and refused to return them.
9. That Suwain indicated that she was hired in Chuuk to come to Guam to work as a waitress in a restaurant or a store.
10. That upon her arrival on Guam, "Mama San," and her husband (unidentified in report) picked

her up at the Airport and transported her to the Blue House, where she noted that it was a Bar and not a Restaurant.

11. That Suwain was then transported to another female employee's residence in Toto, Guam (exact location unknown) to lose weight.
12. That she ran away to her cousin, Elizabeth Aizawa's residence in Latte Heights area of Mangilao, Guam.
13. That on December 27, 2007, Suwain and Aizawa returned to the Blue House to retrieve her passport.
14. That they were informed by Mama San that she (Suwain) must sign a document in the presence of the Police so that she (Mama San) can be reimbursed.
15. That at about 1:00AM on the same date, Officer Laxamana met Mama San, the owner of the Blue House, identified as Song Ja Cha (Defendant).
16. That Cha informed Officer Laxamana that the reason she had the passports for the girls within her residence, and gave the reason for her having the passports was so she could get Guam ID's and Health Certificates to work at the Blue House.
17. That Officer Laxamana and other Officers requested that she close the Blue House for the evening due to the investigation, to which she agreed.
18. That Officer Laxamana also requested her presence at the Tamuning Precinct for an interview.
19. That Officer Laxamana conducted a second interview of Suwain at the Tamuning Precinct at 2:40AM on the same date.
20. That an additional statement received by Officer Laxamana from Suwain indicated that Cha informed Suwain that signing the document in the presence of the Police was to pay her (Cha) back for the cost of buying her passport and other miscellaneous expenses.
21. That Suwain was also recruited in Chuuk to work at the Blue House and that Cha bought her passport and airfare to Guam from Chuuk.
22. That at about 4:05AM on the same date, Officer Laxamana interviewed Song Ja Cha at the Tamuning Precinct.
23. That Cha informed Officer Laxamana that she had an employee, identified in the report as Nana Tipimgemi (sic).
24. That Nana's sister and father, identified in the report only as "Sailyn," and "Serko," were helping her to recruit employees from Chuuk.
25. That Cha stated that she pays her employees a monthly wage of one thousand two hundred dollars ($1,200.00), and that she provides her employees with free housing, food, and transportation.
26. That Cha stated that she had no knowledge of the allegation of prostitution within her

business.

27. That I reviewed a copy of the Supplemental Report submitted by Police Officer I Norbert T. Tan.
28. That at 12:30AM on January 13, 2008, Officer Tan arrived at the Blue House and was instructed by his supervisor, PO3 T.B. Manibusan, to meet with "Vivian & Cindy" to clarify if they were being held against their will.
29. That he proceeded into the Blue House, where he met with Cindy, identified as Simirina Samuel (F/Chuukese/DOB: June 22, 1985).
30. That he inquired from Samuel if she knew where Vivian was, to which Cindy did not.
31. That Samuel inquired from other employees as to Vivian's whereabouts, to which they pointed towards the extension of the lounge.
32. That Cindy then proceeded to the "Comfort Room Area" (small rooms used for private sessions), and he followed.
33. That upon entering the extended part of the lounge, he noted multiple rooms, most of which were slightly opened.
34. That he noted Samuel calling for Vivian, to which he heard a response from room #3.
35. That he knocked on the closed door.
36. That after several knocks, Vivian answered the door, and was clad in a red dress which he described as "if she had rushed to put it on."
37. That Vivian was identified as Daileen Robert (F/Chuukese/DOB: April 23, 1989).
38. That he looked in the room and he noted a male individual identified as Sonny Aytona Bituin (M/Filipino/DOB: September 15, 1957).
39. That Bituin was hiding behind a wall by the entrance, holding onto his pants.
40. That Bituin's belt was unbuckled, his pants unbuttoned, and he had no shirt on.
41. That at 12:40AM on the same date, Officer Tan conducted an interview of Bituin at the Blue House.
42. That Bituin informed Officer Tan that he knew what happens in the comfort room, where he was found semi-naked.
43. That Bituin was not doing anything sexual, and he was only getting a massage.
44. That Bituin stated that he only paid twenty-five dollars ($25.00) for the massage, and did not have enough money to pay for sexual intercourse, which he stated to be forty dollars ($40.00).
45. That Bituin stated that if he wanted to engage in sexual activity, he would have to buy the female a forty dollar ($40.00) drink in order for him to have her company in the comfort room.
46. That when asked if there was any physical contact other than the massage, Bituin stated that

they were only kissing each other on the cheek.

47. That at 2:40AM on the same date, Officer Tan conducted an interview of Daileen Robert ("Vivian") at the Blue House.
48. That Robert informed Officer Tan that she was being prostituted against her will and that she has been wanting to leave the establishment, but could not due to Cha having her passport.
49. That Robert stated that she was recruited while she was in Chuuk and was promised a job as a waitress in a restaurant or an employee in a convenient (sic) store.
50. That upon her arrival on Guam, she was taken to the Blue House to work, and was briefed in what was expected of her by Cha, which was to sit with the customers and entertain them.
51. That if a customer buys a "ladies drink," which costs forty dollars ($40.00), she would have to accompany the customer to the comfort room, give them a massage, then follow with sexual activity.
52. That if she refused sexual activity and the customer complains to Cha, she would get into trouble and would not be fed for the night.
53. That Robert arrived on Guam on December 10, 2007, and has since engaged in sex with over ten customers.
54. That when she was caught with Bituin, Bituin had already paid the forty dollars ($40.00) to engage in sexual activity.
55. That prior to Officer Tan knocking on the door, Robert and Bituin were fully naked and engaged in sexual touching, which was described by Robert to be Bituin touching and rubbing Robert's private parts, such as her vagina and breasts.
56. That at 3:00AM on the same date, Officer Tan conducted an interview of Simirina Samuel ("Cindy").
57. That Samuel informed Officer Tan that she arrived on Guam on December 1, 2008 (sic) and was brought immediately to the Blue House to start working as a waitress.
58. That she was also promised a waitress position in a restaurant or a store employee in a convenient (sic) store.
59. That since she started working at the Blue House, she has had about ten to twenty customers with whom she had engaged in sexual activity with for monetary payment.
60. That on her first night working, she had sexual intercourse with a customer.
61. That the forty dollars ($40.00) goes straight to Cha to pay for the ladies drink.
62. That both Robert and Samuel stated that they were virgins prior to being employed at the Blue House, and that they both have yet to be paid by Cha.
63. That at 5:45AM on the same date, Officer Tan conducted an interview of Freda Eseun (F/Chuukese/DOB: September 4, 1984).

64. That Eseun informed Officer Tan that she was hired by Cha in 2006, but quit in September of 2007 to pursue a relationship with a customer.
65. That the relationship did not work out, and she returned to the Blue House on October 9, 2007.
66. That she is a waitress but would sometimes bartend and that she does not have an alcohol (ABC) license.
67. That along with being a waitress, she also accompanies customers to the "comfort room," where she drinks an alcoholic beverage with the customer and engages in sexual activity and sexual intercourse with the customer for a monetary payment.
68. That she is paid the sum of six hundred dollars ($600.00) bi-weekly from Cha.
69. That she goes into the comfort room to give massages, but does not have any documents saying that she is a trained massage therapist.
70. That when asked if Cha knew of the activity as the Blue House, Eseun informed him that she did not and that Cha only tells them to go into the comfort room to massage the customer.
71. That Eseun estimated that she has about 2-3 customers a night with whom she engages in sexual activity with.
72. That when a customer pays forty dollars ($40.00) for sexual activity, thirty-five dollars ($35.00) goes to the employee and five dollars ($5.00) goes to Cha.
73. That she admitted that she is one of the girls who watch over the other girls to make sure that they do not leave the Blue House and they do not talk about what they do in the Blue House with anyone over the telephone.
74. That when the girls are out at the mall or anywhere away from the Blue House, they are always with Cha, and they are constantly monitored by her.
75. That she had knowledge of prostitution occurring prior to her leaving in (September) 2007.
76. That since her return, she has not had knowledge of prostituting in the Blue House.
77. That she contradicted her statement (#76) in stating that she had sexual intercourse with two male customers last night (January 12-13, 2008) for a monetary payment of forty dollars ($40.00) each.
78. That I reviewed a copy of the Supplemental Report submitted by Police Officer I Jeremiah J. Cruz.
79. That his report indicated that at 3:12AM on January 13, 2008, he conducted an interview of a female individual, identified in his report as Maktalena Chanten (F/Chuukese/DOB: March 27, 1986) at the Tamuning Precinct.
80. That Chanten informed Officer Cruz that while she was in Chuuk, she was recruited to work as a waitress in a restaurant on Guam by Nana Tipingeni's father (unknown name).

81. That she arrived on Guam on October 18, 2007, and was met at the Airport by "Mama San," who employed her at the Blue House.
82. That Mama San confiscated her passport and informed her that if she tried to flee the Blue House, Mama San would contact the Police and have her arrested.
83. That she was later instructed to "take care of customer's" in the back rooms.
84. That a customer (not identified) requested sexual intercourse from her, to which she refused.
85. That the customer complained to Mama San, at which time Mama San became angry with her and instructed her to "take care of customer."
86. When she refused to have sexual intercourse, Mama San would not allow her to eat.
87. That Mama San would also prevent her from eating if she did not perform to the customer's expectations.
88. That she attempted to leave the Blue House on January 11, 2008, but was stopped by four other Blue House employees.
89. That her payment for working was being sent to Chuuk, and that she received money monthly depending on how many men she had intercourse with.
90. That she has received a total of about six hundred dollars ($600.00) since she has been on Guam and employed with the Blue House.
91. That she did not wish to perform sex with the customers, but felt compelled to, to please Mama San.
92. That Mama San had purchased a plane ticket for her to come to Guam.
93. That at 3:39AM on the same date, Officer Cruz conducted an interview of Lusy Paul (F/Chuukese/DOB: September 22, 1986) at the Tamuning Precinct.
94. That Paul informed Officer Cruz that she was brought to Guam (from Chuuk) believing that she was to work at a restaurant as a waitress.
95. That when she arrived on Guam, she met with Mama San, who employed her at the Blue House.
96. That she was also housed at the Blue House.
97. That Mama San confiscated her passport and informed her that if she tried to flee the Blue House, Mama San would contact the Police and have her arrested.
98. That while employed at the Blue House, she was instructed to "take care of the customers."
99. That when she was approached by a male customer to have sex with him, she refused.
100. That he complained to Mama San, who became angry with her and would not allow her to eat.
101. That she then had sexual intercourse with the customer.
102. That Paul and Chanten were part of a religious youth group that proclaimed to abstain

from sex until marriage.

103. That Paul felt violated being forced to have sex with men that she does not know.

104. That Mama San would also prevent her from eating if the customer complained that they were not satisfied.

105. That at 4:28AM on the same date, Officer Cruz conducted an interview of Nana Tipingeni (F/Chuukese/DOB: November 4, 1988) at the Tamuning Precinct.

106. That Tipingeni informed Officer Cruz that she has been employed at the Blue House for about three months.

107. That Mama San had contacted her father in Chuuk and requested for her to come to Guam to work at her bar.

108. That Mama San knew her father because he used to be a regular customer at the Blue House when he was on Guam.

109. That while employed at the Blue House, she only performed massages with the customer.

110. That she did not know anything about sex happening within the establishment.

111. That Tipingeni later recanted her statement and informed Officer Cruz that she did have sexual intercourse with the customers, which was per Mama san's instructions.

112. That she was afraid to admit it because she was under the impression that if she spoke with the Police, she would be arrested.

113. That she did not wish to have sexual intercourse with the customer, however Mama San became angry with her and yelled at her.

114. That she was also worried that if she did anything wrong, she would be fired from the club, and since her only relative is an employee at the Blue House, she consented to the sex.

115. That she wants to leave the establishment, but Mama San confiscated her passport.

116. That at 6:54AM on the same date, Officer Cruz conducted an interview of Kina Choiter (F/Chuukese/DOB: January 10, 1987) at the Tamuning Precinct.

117. That Choiter stated to Officer Cruz that she arrived on Guam in June of 2007, and has been working at the Blue House since.

118. That she and a customer would go to a private room where she would massage him.

119. That if he requested for sexual intercourse, she would comply.

120. That she would have sexual intercourse with them because she was afraid of Mama San, and that Mama San had hit her before for not having sex with customers.

121. That at 9:20AM on the same date, Officer Cruz conducted an interview of Saknin A. Weria (F/Chuukese/DOB: January 10, 1985) at the Tamuning Precinct.

122. That Weria stated to Officer Cruz that she has been employed at the Blue House for three years as both a waitress and a bartender.

123. That she has had sex with the customer's, but Mama San has no knowledge of the sex.
124. That she had sex to get more money.
125. That the more drinks the customers buy for her, the more money she gets.
126. That she received about one thousand dollars ($1,000.00) per month for her services.
127. That she has knowledge of the other girls having sex with the customers.
128. That I know and work with Special Agent Bia A. Nanoto.
129. That at 11:30AM on January 13, 2008, Special Agent Nanoto conducted a briefing at the Criminal Investigations Section Offices in Tiyan.
130. That I know Special Agent Nanoto to be fluent in reading, speaking, and writing in the Chuukese language, as his ethnicity is Chuukese, and I have utilized his skills in the past as a translator.
131. That Special Agent Nanoto informed me that he was present at the Tamuning Precinct and acted as a translator during several of the interviews of the Blue House employees.
132. That he informed me that during the interview of Maktalena Chanten, he assisted Officer Cruz as an interpreter.
133. That during the interview, Chanten made several statements relating to the existence of a video surveillance system, with cameras covering both the interior and exterior of the Blue House.
134. That he informed me that during the interview of Lusy Paul, he again assisted Officer Cruz as an interpreter.
135. That during the interview, Paul stated that prior to the Police arriving, she had intercourse for payment with three individuals.
136. That the first individual was an African American male, who took his used condom with him after he ejaculated.
137. That the second was a Filipino male, who did not use a condom, and ejaculated on the couch in room #5.
138. That the third was an African American male who used a condom, and discarded the condom in a trash can in room #5.
139. That I know and work with Special Agent Brian A.C. Santos.
140. That at 9:35PM on January 13, 2008, I was contacted by Officer Santos, who informed me that he had been assigned to proceed to the Blue House and the adjoining residence to relinquish medication and medical supplies to the defendant's husband, identified as In H. Cha (M/Korean/DOB: March 4, 1951).
141. That while at the Blue House, In Cha informed him that the building that housed the Blue House had two addresses.

142. That the Blue House was noted to be at 910 North Marine Drive in (Harmon) Tamuning, Guam.
143. That their residence adjoining the Blue House was noted to be at 910-A North Marine Drive in (Harmon) Tamuning, Guam.
144. That In Cha allowed Special Agent Santos to view the business license for the Blue House, which listed the address as LOT 5097-4 Finegayan Harmon, Guam.
145. That while at the Blue House, Special Agent Santos met with a person he knew to be Attorney Curtis Vandeveld.
146. That Attorney Vandeveld informed Officer Santos that there was two hundred and fifty thousand dollars ($250,000.00) hidden in the residence.
147. That Attorney Vandeveld informed Special Agent Santos that the money was to be used as a bid for a project (unspecified) for In Cha's business, identified as Asia Construction.
148. That Attorney Vandeveld identified In Cha as the majority owner of Asia Construction.

### SPECIAL SIGNIFICANCE OF FACTS

Based upon my training and experience, I am able to advise that the facts set forth above have special significance for the following reasons:

A. That a video surveillance system has been reported as being present at the Blue House.
B. That the passports of several of the employees of the Blue House have been reported to be at the residence of the defendant.
C. That the passports were reported to be withheld from the employees by the defendant.
D. That during her interview, the defendant indicated that her purpose for withholding the passports from her employees was to utilize the documents to obtain Guam Identification Cards and Health Certificates for them.
E. That contradicting statements offered by current employees of the Blue House indicate that the defendant took possession of the passports as a form of control over the employees.
F. That reports received from the employees of the Blue House indicate that the defendant paid for their plane tickets and passports for them to come to Guam.
G. That reports received from the current employees and a client of the Blue House indicates that the price for a drink for the employees is twenty dollars ($20.00), but when payment is received in the sum of forty dollars ($40.00), sexual intercourse is performed for the payment.
H. That reports received from the current employees indicate that sexual intercourse has occurred on numerous occasions at the Blue House, and that evidence consisting of bodily fluids is

present within the establishment.
I. That several of the employees of the Blue House have indicated that their payments are either being forwarded to their families in Chuuk, or they have yet to be compensated for their services.
J. That although the defendant's residence and business are listed as two separate addresses, the employees indicated that there is a doorway in the interior of the establishment, which allows a person to pass between the two locations.

## ITEMS TO BE SEARCHED FOR AND SEIZED

Refer to Attachment A.

Based on the foregoing, I believe that there is Probable Cause that the evidence pertinent to this case, to wit, the items listed in "Attachment A," are within the location(s) described as the Blue House, a blue with white trim concrete in construction building housing the Blue House Lounge, identified as 910 and 910-A North Marine Drive, in the Harmon/Upper Tumon area of Tamuning, Guam, further described as LOT 5097-4 Finegayan Harmon, Guam.

It is therefore that I make this Affidavit as an application for a Warrant to conduct a search of the Blue House Lounge, identified as 910 and 910-A North Marine Drive, in the Harmon/Upper Tumon area of Tamuning, Guam, further described as LOT 5097-4 Finegayan Harmon, Guam ,and to seize the said items of evidence.

Further, your affiant sayeth naught.

JOHN A. PEREZ #622
SPECIAL AGENT/CIS, CID
GUAM POLICE DEPARTMENT

SUBSCRIBED AND SWORN TO BEFORE ME this 14th day of **January, 2008**, at  10:25 AM , in Hagåtña, Guam.

_____
JUDGE, SUPERIOR COURT OF GUAM

JAN 15 2008

Evelyn B. Bonto
Deputy Clerk, Superior Court of Guam

# EXHIBIT C


2:14PM

## IN THE SUPERIOR COURT OF GUAM

| | | |
|---|---|---|
| PEOPLE OF GUAM | ) | SEARCH WARRANT NO._____ |
| | ) | |
| vs. | ) | **SEARCH WARRANT** |
| | ) | |
| SONG JA CHA | ) | Guam Police Department Case Nos. 2008-01208 |
| F/KOREAN/SS#XXX-XX-9354 | ) | |
| DOB: JANUARY 7, 1942 | ) | |
| | ) | |
| BLUE HOUSE LOUNGE | ) | |
| LOT 5097-4 (FINEGAYAN, HARMON) | ) | |
| 910 NORTH MARINE DRIVE | ) | |
| HARMON / UPPER TUMON AREA | ) | |
| TAMUNING, GUAM        AND | ) | |
| | ) | |
| 910-A NORTH MARINE DRIVE | ) | |
| HARMON / UPPER TUMON AREA | ) | |
| TAMUNING, GUAM | ) | |
| | ) | |
| Defendant | ) | |

An affidavit having been sworn to before me on this **14th** day of **January, 2008**, by Special Agent John A. Perez of the Guam Police Department, and probable cause having been shown by said affidavit that the above captioned location(s) contain evidence of the items described in "Attachment A;"

**IT IS HEREBY ORDERED** that Special Agent John A. Perez, and/or any and all Peace Officers of Guam, gain entry into, and conduct a search of the Blue House Lounge and the defendant's residence, located at 910 and 910-A North Marine Drive, in the Harmon/Upper Tumon area of Tamuning, Guam, further described as LOT 5097-4 Finegayan Harmon, Guam, and to seize the evidence and items of evidential value.

EXHIBIT C

Search Warrant No. _____

This warrant must be executed within ten (10) days from issuance hereof, and the Officer or Officers executing this warrant are hereby ordered to promptly return this warrant to the undersigned judge, together with a written inventory of all property seized pursuant to this warrant, said return to be made in no case later than ten (10) days from the issuance hereof.

This warrant may begin execution during the daytime hours pursuant to 8 GCA §35.20(c) between the hours of 6:00AM and 10:00PM.

Dated this 14th day of **January, 2008**, at _10:25 AM_, in Hagåtña, Guam.

_____
JUDGE, SUPERIOR COURT OF GUAM

# LISTING OF ITEMS TO BE SEARCHED FOR AND SEIZED

1. Photographs and/or digital image files (still or video/audio recordings) of individuals and individuals engaged in sexual activity;
2. Photographs and/ or digital image files (still or video/audio recordings) of the property in and around the captioned area indicated as being the place where prostitution and/or human trafficking has occurred;
3. Video surveillance systems, which contain items 1 and 2 of this attachment;
4. Computer/Video Surveillance equipment, hardware, software, documentation, passwords, data security items, and electronically stored data connected to the video surveillance system, as well as documentation, including written, recorded, printed, or electronically stored material, which explains how to configure or use the Computer/Video Surveillance hardware, software, or related items.
5. All records and documents concerning prostitution and/or human trafficking, and all items which may contain said evidence.
6. Items of identification such as letters, bills, receipts, photographs, vehicle registrations, and the like;
7. Illegally obtained proceeds derived from violations of federal or state statutes concerning prostitution and/or human trafficking, such as U.S. currency, gold, silver, stocks, bonds, expensive electronic equipment and the like;
8. Books, records, electronic files, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers, inclusive of, but not limited to Passports, relating to the transportation, ordering, or employing of individuals for the purpose of prostitution and/or human trafficking;
9. Currency, financial instruments, precious metals, jewelry, vehicle registration receipts, property titles, and other items of value and/or proceeds of transactions relating to obtaining, transferring, secreting, profiteering or spending large sums of money made from engaging in prostitution and/or human trafficking;
10. Records evidencing significant cash expenditures, such as aircraft, boats, vehicles, and other items of value that are the proceeds of prostitution and/or human trafficking, and further showing the concealment of the source and ownership of such cash, proceeds, and items of value by use of false names, aliases, postal box addresses, addresses of relatives and acquaintances, sham corporations, and other such devices.

## LISTING OF ITEMS TO BE SEARCHED FOR AND SEIZED

11. Telephone and address books or papers that reflect names, addresses, and/or telephone numbers for their associates in dealing in prostitution and/or human trafficking and persons or entities from whom proceeds of prostitution and/or human trafficking, or other items of value have been obtained, and in what manner said proceeds are presently maintained.
12. Identification documents, and other papers indicating that the persons associated with the organization described within this Affidavit are presently using aliases and assumed names other than their names and are representing themselves to others under these assumed or alias names in order to hide and conceal themselves from law enforcement authorities to disguise their current activities.
13. Trace Evidence, consisting of Latent (Finger) Prints, Blood and/or Bloodlike Substances, as well as other bodily fluids, and all items which may contain said evidence.